IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

```
FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

JUN 16 1997

DAVID J. MALAND, CLERK
BY
DEPUTY
```

LANE McNAMARA, on behalf          §
of himself and all others        §
similarly situated,              §
                                 §
              Plaintiff,         §
                                 §
      v.                         §    Civil Action No.  597CV159
                                 §
JOHN B. FELDERHOF, DAVID G.      §        (Jury Trial Demanded)
WALSH, JEANNETTE WALSH,          §
T. STEPHEN McANULTY,             §
JOHN B. THORPE, ROLANDO C.       §
FRANCISCO, HUGH C. LYONS,        §
PAUL M. KAVANAUGH, SNC-LAVALIN   §
GROUP, INC., KILBORN             §
ENGINEERING PACIFIC LTD., and    §
P.T. KILBORN PAKAR REKAYASA,     §
                                 §
              Defendants.        §

## COMPLAINT

Plaintiff, individually and on behalf of all others similarly situated, by his attorneys, alleges the following upon knowledge, with respect to his own acts, and upon information and belief, with respect to all other matters.

### NATURE OF THE ACTION

1.  Plaintiff brings this suit as a class action on behalf of himself and all other persons or entities who purchased the common stock of Bre-X Minerals Ltd. (the "Class") during the period January 17, 1994 through May 3, 1997, inclusive (the "Class Period"), to recover damages caused to the Class by defendants' violations of federal and common laws.  During the Class Period, defendants engaged in a scheme to defraud or deceive purchasers of Bre-X common stock by misrepresenting Bre-X's ownership of a gold deposit in the Busang area of East Kalimantan, Indonesia, and the

amount of gold contained in the deposit.  This scheme artificially inflated the price of Bre-X common stock during a period when the individual defendants sold shares of Bre-X  stock and reaped insider profits of more than $50.5 million.

## JURISDICTION AND VENUE

2.    This action arises under, among other grounds, Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § § 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

3.    This Court has jurisdiction over this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § § 1331, as well as principles of supplemental jurisdiction.

4.    Venue is proper in this District pursuant to, among other grounds, Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) and (d).  Acts giving rise to the violations complained of occurred or caused injury in this District.  In addition, defendants had disseminated here SEC filings and other public statements regarding Bre-X during the Class Period.  Further, certain defendants are incorporated in Canada and, as such, are alien defendants which properly may be sued in any District.

5.    In connection with the acts and conduct complained of, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and facilities of a national securities exchange.

## CLASS ACTION ALLEGATIONS

6.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of the Class, consisting of all persons who purchased shares of Bre-X common stock during the Class Period of January 17, 1994 through May 3, 1997, inclusive.    Excluded from the Class are the defendants herein, members of their immediate families, any subsidiary, affiliate, or control person of any such person or entity, officers, directors, and control persons of Bre-X, and the legal representatives, heirs, successors or assigns of any such excluded party.

7.    The members of the Class are so numerous that the joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are, at a minimum, several thousand members of the Class. Bre-X has in excess of 200 million shares of its common stock outstanding.    Holders of these shares are believed to be geographically dispersed throughout the United States and Canada. Bre-X common stock is listed and actively traded on the NASDAQ/National Market System, the Toronto Stock Exchange, and the Montreal Stock Exchange.  During the Class Period, many millions of shares of Bre-X were traded.

8.    Plaintiff's claims are typical of the claims of the Class, as plaintiff and all members of the Class purchased shares of Bre-X during the Class Period and sustained damages arising out of defendants' conduct in violation of federal and common law as

complained of herein.  He will fairly and adequately protect the interests of the members of the Class and has no interests that are contrary to or in conflict with those of the Class.

        9.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of the Class.  Among the questions of law and fact common to the Class which predominate over any questions affecting individual members of the Class are:

        (a)  whether defendants violated Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder;

        (b)  whether defendants participated in and pursued the common course of conduct complained of herein;

        (c)  whether documents, filings, releases and statements disseminated, or allowed to be disseminated, to the SEC and the investing public, during the Class Period, omitted and/or misrepresented material facts about the business and prospects of Bre-X;

        (d)  whether the market price of Bre-X stock, during the Class Period, was artificially inflated due to the nondisclosures and/or misrepresentations complained of herein;

        (e)  whether defendants acted knowingly, wilfully, or recklessly in omitting to state and/or misrepresenting material facts; and

        (f)  whether the members of the Class have sustained damages and, if so, what is the proper measure of such damages.

        10.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class

members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

THE PARTIES

11. Plaintiff Lane McNamara is a resident of this District. He purchased shares of Bre-X common stock during the Class Period, as specified in the attached Certification.

12. Defendant John B. Felderhof ("Felderhof") was, at all relevant times, Senior Vice President, Chief Geologist, and Vice Chairman of the Board of Directors of Bre-X. In these capacities, defendant Felderhof received substantial compensation and other perquisites from the company. Felderhof sold 477,900 shares of Bre-X stock, worth at least Can.$33.4 million, during 1996. Service may be made upon defendant Felderhof at his place of residence in the Cayman Islands or at his regular place of business, which is The Bre-X Building, 119-14 Street, N.W., Calgary, Alberta, T2N 1Z6.

13. Defendant David G. Walsh ("D. Walsh") was, at all relevant times, Chief Executive Officer, President, and Chairman of the Board of Directors of Bre-X. In these capacities, defendant D. Walsh received substantial compensation and other perquisites from the company. D. Walsh sold 300,000 shares of Bre-X stock, worth at least Can.$7.7 million, during 1996. Service may be made upon defendant D. Walsh at his place of residence in the Bahamas or at

-5-

his regular place of business, which is The Bre-X Building, 119-14 Street, N.W., Calgary, Alberta, T2N 1Z6.

14. Defendant Jeannette Walsh ("J. Walsh") was, at all relevant times, Secretary of Bre-X. In this capacity, defendant J. Walsh received substantial compensation and other perquisites from the Company. J. Walsh sold 450,200 shares of Bre-X stock, worth at least Can.$19.4 million, during 1996 service may be made upon defendant J. Walsh at her place of residence in the Bahamas or at her regular place of business, which is The Bre-X Building, 119-14 Street, N.W., Calgary, Alberta, T2N 1Z6. J. Walsh is the wife of D. Walsh.

15. Defendant T. Stephen McAnulty ("McAnulty") was, at all relevant times, Vice President of Investor Relations and a director of Bre-X. In these capacities, defendant McAnulty received substantial compensation and other perquisites from the company. McAnulty sold 245,000 shares of Bre-X stock, worth at least Can.$6.2 million, during 1996. Service may be made upon defendant McAnulty at his place of residence in Calgary, Alberta, Canada or at his regular place of business, which is The Bre-X Building, 119-14 Street, N.W., Calgary, Alberta, T2N 1Z6.

16. Defendant John B. Thorpe ("Thorpe") was, at all relevant times, Vice President of Administration and Treasurer of Bre-X. In these capacities, defendant Thorpe received substantial compensation and other perquisites from the company. Thorpe sold 60,700 shares of Bre-X stock, worth at least Can.$1.46 million, during 1996. Service may be made upon defendant Thorpe at his

place of residence in Calgary, Alberta, Canada or at his regular place of business, which is The Bre-X Building, 119-14 Street, N.W., Calgary, Alberta, T2N 1Z6.

17.   Defendant Rolando C. Francisco ("Francisco") was, at all relevant times, Executive Vice President, Chief Financial officer, and a director of Bre-X.  In these capacities, he received substantial compensation and other perquisites from the company. Francisco sold 50,000 shares of Bre-X stock, worth at least Can.$1.25 million, during 1996.  Service may be made upon defendant Thorpe at his place of residence in Calgary, Alberta, Canada or at his regular place of business, which is The Bre-X Building, 119-14 Street, N.W., Calgary, Alberta, T2N 1Z6.

18.   Defendant Hugh C. Lyons ("Lyons") was, at all relevant times, a Director of Bre-X.  Service may be made upon defendant Lyons at his place of residence or at The Bre-X Building, 119-14 Street, N.W., Calgary, Alberta, T2N 1Z6.

19.   Defendant Paul M. Kavanaugh ("Kavanaugh") was, at all relevant times, a Director of Bre-X.  Service may be made upon defendant Lyons at his place of residence or at The Bre-X Building, 119-14 Street, N.W., Calgary, Alberta, T2N 1Z6.

20.   Defendants Felderhof, D. Walsh, J. Walsh, McAnulty, Thorpe, Francisco, Lyons, and Kavanaugh are sometimes referred to herein collectively as the "individual defendants."

21.   Because of their positions with the Company, the individual defendants had access to the material adverse non-public information about its business, finances, products, markets, and

present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to them in connection therewith.

22. The individual defendants, by reason of their executive and directorial positions with Bre-X, were controlling persons of Bre-X and had the power and influence, and exercised the same, to cause Bre-X to engage in the conduct complained of herein.

23. During the Class Period, each of the individual defendants occupied positions that made them privy to non-public information concerning Bre-X. Because of their positions and access, each of these defendants knew that the material adverse facts specified herein were being concealed from the public.

24. As officers, directors, and/or controlling persons of a publicly-held company whose common stock was traded in open, actively traded, and efficient markets of the NASDAQ Stock Exchange, the Toronto Stock Exchange, and the Montreal Stock Exchange, the individual defendants had a duty to disseminate accurate and truthful information promptly with regard to Bre-X's operations, business, finances, markets, management, earnings, and future business prospects, to correct any previously issued statements that had become untrue, and to disclose any adverse trends that would materially affect the present and future

operating results of the company, so that the market price of Bre-X stock would be based upon truthful and accurate information.

25. The individual defendants controlled and/or possessed the power and authority to control the contents of Bre-X reports, prospectuses, press releases, and presentations to securities analysts and the investing public. The individual defendants participated in the dissemination of the Company's filings, reports, and press releases alleged herein to be misleading and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the individual defendants knew or recklessly disregarded that the material adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were materially false and misleading. As a result, the individual defendants are responsible for the accuracy of the public reports and releases and are liable for the representations contained therein.

26. Defendant SNC-Lavalin Group, Inc. is a Canadian corporation headquartered in Montreal, Quebec, Canada. It does business in the United States and throughout the world. SNC-Lavalin may be served with service of process at 1815 H Street N.W., Suite 500, Washington, D.C. 20006.

27. Defendant Kilborn Engineering Pacific Ltd. is a Canadian corporation headquartered in Vancouver, British Columbia, Canada. Kilborn Engineering may be served with service of process

at 1380 Burrard Street, Suite 400, Vancouver, British Columbia, Canada V6Z 2B7.

28. Defendant P.T. Kilborn Pakar Rekayasa is an Indonesian company headquartered in Jakarta. P.T. Kilborn may be served with service of process at Cilandak Commercial Estate, JL Raya KKP, Cilandak, Jakarta, 12560 Indonesia.

29. Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Bre-X stock, including making materially false and misleading statements. The scheme deceived the investing public regarding Bre-X, artificially inflated the price of Bre-X stock, and caused plaintiff and the Class to purchase Bre-X stock at artificially inflated prices.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

30. At all relevant times, the market for Bre-X stock was an efficient market for the following reasons, among others:

(a) Bre-X common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ/National Market System, the Toronto Stock Exchange, and the Montreal Stock Exchange, highly efficient and automated markets.

(b) As a regulated issuer, the Company filed periodic public reports with the SEC.

(c) Bre-X communicated with public investors via established market communication mechanisms, including through disseminations of press releases on the circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

(d) Bre-X was followed by prominent securities analysts whose reports and other public statements

concerning Bre-X were widely disseminated to investors.

31. The market for Bre-X securities promptly digested current information regarding Bre-X from all publicly available sources and reflected such information in Bre-X's stock price. Under these circumstances, all purchasers of Bre-X shares during the Class Period suffered similar injury through their purchase of shares at artificially inflated prices and a presumption of reliance applies.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

32. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, there was no statement made with respect to any of those representations forming the basis of this Complaint that actual results "could differ materially from those projected," and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each

of those statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Bre-X who knew that those forward-looking statements were false when made.

THE FRAUDULENT SCHEME AND COURSE OF BUSINESS AND
FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

33. In 1993 and 1994, Bre-X entered into various agreements to acquire control of a gold deposit exploration project in the Busang region of East Kalimantan, Indonesia. The project consists of three properties: Busang I, which is known as the Central Zone; Busang II, which is known as the Southeast Zone; and Busang III, which is known as the Northwest Zone.

34. Beginning on January 17, 1994, Bre-X made positive statements to the investing public about the gold deposits in the Busang properties. On that date, Bre-X publicly announced that drilling in Busang revealed significant assay results with favorable gold mineralization.

35. Subsequent to that announcement, Bre-X issued a series of press releases that described the results of drilling in Busang in positive terms. The press releases announced ever-increasing calculations of gold resources in the Central Zone. During this time, Bre-X also announced that it had expanded its drilling program into the Southeast Zone.

36. On October 17, 1995, Bre-X publicly announced the results of drilling in the Southeast Zone and an updated calculation of resources in the Central Zone. According to

-12-

defendants, the Central Zone contained in excess of 2.75 million ounces of gold. However, defendant Felderhof indicated that the Southeast Zone had the potential to possess even greater amounts of gold than the Central Zone, stating that the Central Zone "pales in comparison" to the Southeast Zone. Touting the size of gold deposits in the Busang properties, defendant Felderhof stated that "the Busang project in its entirety has the potential of becoming one of the world's great gold orebodies."

37. On December 15, 1995, Bre-X issued a year-end report on its mining properties in Indonesia. Defendant Felderhof stated that the Busang deposit "is very likely to become a gold mine of elite world class status. Our current objective is to drill out 30 million ounces by early fall 1996."

38. In January of 1996, defendant Felderhof publicly stated: "A resource of 30 million ounces can be readily attained in view of the recent results and visuals of the outstanding four holes."

39. In early 1996, Bre-X issued its annual report for 1995. The report states that Bre-X owns 80% of the Central Zone, 90% of the Southeast Zone, and 90% of the Northwest Zone. In addition, the report describes Busang as a world class gold deposit.

40. Throughout 1996, Bre-X continued to make public announcements of increasing gold resource levels. On February 20, 1996, Bre-X issued a press release reporting calculations of the Busang resource, including an initial calculation for the Southeast

-13-

Zone. The press release indicated the total indicated and inferred resources at Busang amounted to more than 15 million ounces of gold. Company officials publicly represented that 30 million ounces of gold were readily attainable.

41. On April 17, 1996, Bre-X issued a press release announcing a resource calculation for two sections of the Southeast Zone. Based on the calculation, the Busang deposit contained a total of 24.87 million ounces of gold, a 60 percent increase over the previous estimate.

42. On June 20, 1996, Bre-X issued another press release announcing an updated resource calculation. That calculation indicated that the deposit contained a total of 39.15 million ounces of gold. Bre-X publicly declared its "objective to outline 50 million ounces in the measured/indicated resource category by the end of 1996."

43. On July 22, 1996, Bre-X released another updated calculation of resources, which indicated that based on additional drilling results from the Southeast Zone, the Busang deposit contained, in total, 46.92 million ounces of gold.

44. On December 3, 1996, Bre-X issued a press release indicating the results of another updated resource calculation. Based on further drilling results from the Southeast Zone, the Busang deposit was calculated to contain 57.33 million ounces of gold, as reported in the press release. The cost of producing the gold in Busang was calculated to be $96 per ounce, which was

-14-

substantially lower than the average gold production cost worldwide.

45.   Shortly thereafter, during the week of January 20, 1997, the Company's geology, mapping, and drill results materials were destroyed in a fire at Bre-X's base in Busang.

46.   On February 17, 1997, Bre-X publicly announced the results of another calculation of resources at Busang.  In a press release, Bre-X indicated that the Busang deposit contained 70.95 million ounces of gold.  Bre-X explained that "much of the increase c[ame] in the measured and indicated category."

47.   Three days later, on February 20, 1997, defendant Felderhof publicly stated that he felt "very comfortable" that Busang contained a potential of 200 million ounces of gold.  This was more than a twelve-fold increase in the announced size of the Busang deposits one year earlier.

48.   On February 20, 1997, defendants D. Walsh, Felderhof, and Francisco participated in a conference call with mining analysts.  During the call, defendant D. Walsh conceded the falsity of Bre-X's earlier representations about the size of Bre-X's ownership interest in the Busang project, stating that investors and others "mistakenly thought that we somehow owned 90 percent of this property." This understanding "was never the practical reality," he said.

49.   On March 19, 1997, Bre-X publicly reported that Michael de Guzman, one of its chief geologists at Busang and one of the persons who had discovered the Busang deposit, had died when he

fell out of a helicopter while in flight. Bre X characterized the incident as a suicide.

50. In an announcement that stunned the investing public, Bre-X admitted on March 26, 1997 that the Busang gold deposit may not be as large as previously represented. The company revealed that an independent mining consultant, Strathcona Mineral Services Ltd., which had been recently hired, had concluded that there was a "strong possibility that the potential gold resources on the Busang project in East Kalimantan, Indonesia have been overstated because of invalid samples and assaying of those samples."

51. On the same day, Freeport-McMoRan Cooper & Gold Inc. ("Freeport") reported that its analyses of core samples within the Southeast Zone "indicate insignificant amounts of gold." Freeport is a mining company that had agreed to develop, finance, and operate a mine in Busang, and it conducted the analyses as part of its due diligence.

52. The next day, on March 27, 1997, Bre-X announced that Freeport's due diligence had revealed "visual differences in gold particles" contained in samples from core holes drilled by Freeport and those drilled by Bre-X.

53. Throughout the Class Period, the rise in the price Bre-X common stock had been dramatic, increasing from pennies per share in 1994 to a high of $20.75 in mid-1996, after a ten-for-one stock split. In response to the disclosures made on March 27, 1997, the price of Bre-X common stock plummeted 83%, to $1.97 per

share. This constituted a market value loss of more than $2.2 billion. Approximately fifteen million shares were traded on the NASDAQ system, and the volume was so heavy on the Toronto Stock Exchange that it overloaded the computer system and forced the market to close early. Trading of shares of Bre-X stock was later halted.

## SCIENTER ALLEGATIONS

54. As alleged herein, defendants acted with scienter. They knew that the public documents and statements issued or disseminated in the name of Bre-X were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Bre-X, their control over, and/or receipt and/or modification of Bre-X's allegedly materially misleading misstatements and/or their associations with the company which made them privy to confidential proprietary information concerning Bre-X, participated in the fraudulent scheme alleged herein. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.

55. The individual defendants engaged in such a scheme to inflate the price of Bre-X's securities in order to protect and

enhance their executive and/or directorial positions and the substantial compensation and other perquisites and prestige they obtained thereby.

56. In addition, the individual defendants were motivated to participate in this scheme to enable them to profit by selling shares of Bre-X stock at artificially inflated prices. During the Class Period, the individual defendants reaped proceeds of more than $50.5 million from sales of Bre-X common stock during the Class Period, while they had access to and/or were in possession of material, non-public, adverse information about the company, notwithstanding their duty to refrain from selling Bre-X stock under these circumstances.

### FIRST CAUSE OF ACTION

#### Violation of Section 10(b) of the Exchange Act And Rule 10b-5 Promulgated Thereunder

57. Plaintiff repeats and realleges each and every allegation contained in the above paragraphs, as if fully set forth herein. This claim is asserted against all defendants.

58. During the Class Period, defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Bre-X securities; and (iii) cause plaintiff and other members of the Class to purchase Bre-X securities at inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, defendants took the actions set forth herein.

59. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Bre-X stock, in an effort to maintain artificially high market prices for Bre-X's securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

60. Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal material adverse information about the business, operations, and future prospects of Bre-X, as specified herein. They employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein, all in an effort to assure investors of Bre-X's great and increasing value, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Bre-X in light of the circumstances under which they were made, not materially misleading, as set forth more particularly herein, and engaged in

transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Bre-X stock during the Class Period.

61. Each of the individual defendant's primary liability and/or controlling person liability arises from the following facts: (i) each was a high-level executive and/or director at the company during the Class Period and/or was a member of its management team; (ii) each, by virtue of his/her responsibilities and activities as a senior officer and/or director of Bre-X, was privy to and participated in the drafting, reviewing, and/or approving the misleading statements, releases, reports, and other public representations of and about Bre-X; (iii) each knew or had access to material adverse non-public information about Bre-X, which was not disclosed; and (iv) each was aware of the company's dissemination of information to the investing public which he/she knew or recklessly disregarded was materially false and misleading.

62. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Bre-X's true assets and future business prospects from the investing public and supporting the artificially inflated price of its stock. As demonstrated by defendants' overstatements and misstatements of the

company's existing business and operations, and future earnings prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge, by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

63. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Bre-X securities were artificially inflated during the Class Period. In ignorance of the fact that market prices of Bre-X's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the markets in which the securities trade, and the truth of any representations made to appropriate agencies and to the investing public, at the times at which any statements were made, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Bre-X's securities during the Class Period at artificially high prices and were damaged thereby.

64. At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the

-21-

true financial condition, worth, and business prospects of Bre-X, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Bre-X securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

65.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

66.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Bre-X securities during the Class Period.

SECOND CAUSE OF ACTION

Violation of Section 20(a) of the Exchange Act
Against the Individual Defendants

67.    Plaintiff repeats and realleges each and every allegation contained in the above paragraphs, as if fully set forth herein.  This claim is asserted against the individual defendants.

68.    The individual defendants acted as controlling persons of Bre-X within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their executive positions, Board membership, and stock ownership, as alleged above, the individual defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends

are false and misleading. Defendants were provided with or had unlimited access to copies of the company's internal reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

69. In particular, defendants had direct involvement in the day-to-day operations of Bre-X and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

70. As set forth above, defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the individual defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the company's securities during the Class Period.

<u>JURY DEMAND</u>

71. Plaintiff demands a trial by jury.

<u>PRAYER</u>

WHEREFORE, plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and their counsel as class counsel;

-23-

(b)  Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorney fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

Dated:  June 16, 1997.

Respectfully submitted,

LAW OFFICES OF YOUNG & PICKETT
4122 Texas Boulevard
P.O. Box 1897
Texarkana, AR-TX  75504
Telephone:  (903)  794-1303  TX
            (501)  774-3206  AR

Facsimile:  (903)  792-5098

By: _____
    Damon Young #22176700

ATTORNEYS FOR PLAINTIFF

-24-

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| LANE McNAMARA, on behalf of himself and all others similarly situated, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. _____ |
| JOHN B. FELDERHOF, DAVID G. WALSH, JEANNETTE WALSH, T. STEPHEN McANULTY, JOHN B. THORPE, ROLANDO C. FRANCISCO, HUGH C. LYONS, PAUL M. KAVANAUGH, SNC-LAVALIN GROUP, INC., KILBORN ENGINEERING PACIFIC LTD., and P.T. KILBORN PAKAR REKAYASA, | § § § § § § § § § § § | (Jury Trial Demanded) |
| Defendants. | § | |

## CERTIFICATION OF PLAINTIFF LANE McNAMARA

Lane McNamara hereby states that:

1.    I have reviewed the Complaint in this matter and authorized the filing of the Complaint on my behalf.

2.    I did not purchase any shares of the common stock of Bre-X Minerals Ltd. at the direction of counsel or in order to participate in this private action.

3.    I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    The following includes all of my transactions in Bre-X common stock during the class period specified in the Complaint:

| TRANSACTION | TRADE DATE | PRICE PER SHARE | QUANTITY |
|---|---|---|---|
| purchase | 04/23/97 | $2 5/8 | 1000 shares |
| purchase | 04/28/97 | $2 11/16 | 1000 shares |

5.    I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years.

6.    I will not accept any payment for serving as a representative party on behalf of a class except to receive my pro rata share of any recovery, or as ordered or approved by the Court including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 29th day of May, 1997.

_____
LANE McNAMARA

-2-